(Not for Publication)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

_____
                                   :
JEAN MARIE SIRAVO,                 :
                                   :
               Plaintiff,    :    Civil No. 07-3282 (RBK)
                                   :
               v.            :    **OPINION**
                                   :
MICHAEL J. ASTRUE, COMMISSIONER    :
OF SOCIAL SECURITY,                :
                                   :
               Defendant.    :
_____:

**KUGLER**, United States District Judge:

      This matter comes before the Court upon appeal by Jean Marie Siravo ("Claimant or Siravo"), pursuant to 42 U.S.C. § 405(g), for review of a final determination of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits ("DIB"). For the reasons set forth below, the Court affirms the ALJ's decision.

**I.    BACKGROUND**

      Siravo alleges that she is disabled with an onset date of May 1, 1999. She alleges that her disability arises from a 1992 accident at work. She now suffers from severe and intractable back pain, which required two back surgeries. In addition to the back pain, Siravo alleges she suffers from depression, anxiety, and sleep disorder.

1

Siravo's disability stems from injuries sustained while working at Ron Newton's Pub in December 1992. (R. at 317). Siravo was lifting a heavy object when she heard a "popping" noise, and within 24 hours she experienced significant lower back pain and bilateral lower extremity discomfort. (R.at 182.) As a result of the injury, Siravo received worker's compensation for one month. (R. at 317.)

Initially, Siravo recovered from the accident. However, in 1996 she started to experience back pain again. Beginning on April 5, 1996, Siravo started treatment with a chiropractor at Newton Medical Center. (R. at 182.) The chiropractor diagnosed Siravo with acute lumbar IVD syndrome and lumbar radiculopathy stemming from the previous work injury. (R. at 182.) Siravo continued therapy with the chiropractor, and on October 7, 1996 the chiropractor diagnosed Siravo with chronic lumbar HNP and acute lumbar radiculopathy. (R. at 210.) On October 9, 2006, Physical Medicine & Diagnostics, Ltd conducted an EMG and determined Siravo had a moderate chronic L5-S1 radiculopathy and recommended she continue with chiropractic care. (R. at 230.) During the course of treatment, Siravo participated in pain management and received epidural shots. (R. at 215.) Siravo continued treatment with the chiropractor. However, on December 22, 1997 Siravo complained of an increase in back pain. (R. at 217.) Specifically, she claimed she could not work. The chiropractor recommended she stop working at her present job and look for a new position. (R. at 217.)

On February 13, 1997, Dr. Mark Chang at Allegany University Hospital performed a Right L5-S1 Laminotomy Diskectomy with a fat graft, to further relieve Siravo's back pain. (R. at 263.) However, the pain persisted and beginning in December 1998, Siravo started seeking treatment for her back from Dr. Joseph Scogna at Neurosurgical Associates, LTD. (R. at 242.) Dr. Scogna

opined that while Dr. Chang performed a successful surgery it was likely Siravo's pain persisted because of the size of the disc herniation and significant intrinsic injury to the nerve. (R. at 242.) Dr. Scogna also noted that Siravo denied having any major motor weakness and no bowel or bladder difficulty. (R. at 242.)

On March 8, 2000, Dr. Scogna performed a second back surgery on Siravo, a lateral bone fusion at L5-S1 and a foraminotomy and lysis of adhesions of the nerve root. (R. at 254.) On March 17, 2000, Dr. Scogna performed a follow-up surgery to remove the spinal stimulator and repair a spinal fluid leak. (R. at 248.) In subsequent follow-up reports, Dr. Scogna indicated Siravo must wear a large brace. (R. at 247.) On May 15, 2000, Dr. Scogna noted that Siravo said she still has some pain but it is not frequent and that she feels much better than prior to her surgery. (R. at 249.) On July 5, 2000, in the last report on the record from Dr. Scogna, he stated Siravo had good motor strength in both her legs, her reflexes were normal except for a depressed right ankle jerk, and he believed she was recovering slowly. (R. at 250.)

Siravo's primary care physician is Dr. Frank Perrone, and he has overseen the treatment of Siravo's back pain. Notably, the medical record does not contain records from Dr. Perrone from 1998 through 2001. The medical record provided by Dr. Perrone is from January 2002 through 2004.

During 2002, Siravo was under the primary care of Dr. Perrone and sought treatment at least eleven times during the year. Siravo primarily received osteopathic manipulative treatment ("OMT") for pain in her back and legs. (R. at 130-135.) OMT is the therapeutic application of manually guided forces by an osteopathic physician to improve physiologic functioning and/or support homeostasis that has been altered by somatic disfunctions, or the treatment a patient

3

receives when seeing an osteopathic physician. On January 21, 2002, Siravo received a Magnetic Resonance Imaging (MRI) on her right foot and right ankle. (R. at 167). Siravo's right foot showed an abnormality of the medial or tibial sesamoid of the first MP joint, which could indicate trauma or avascular necrosis. (R. at 167.) Siravo's ankle showed some mild subcutaneous soft tissue swelling anterior medially and laterally with a small to moderate sized joint effusion. (R. at 168.) No recommendation for care was provided. (R. at 167-68.)

Siravo was treated by Dr. Perrone at least twenty times over the course of 2003. (R. at 117-29.) Siravo primarily received OMT for pain in her neck, upper back, mid back, hips, legs, and feet. (R. at 117-29.) In July, Siravo complained her back "locked up" after swimming and using the diving board. (R. at 127.) On September 22, 2003, Siravo complained she suffered severe back pain because she worked four days the previous week. (R. at 125.) Siravo also noted could no longer work as many hours because her mother-in-law had moved in with the family. (R. at 125.)

In addition to this care provided by her primary physician, Dr. Dahlia Wilson-Irby at Interpretive Neurodiagnostics, LLC conducted sensory nerve conduction on both legs on July 7, 2003. (R. at 160-62.) Dr. Wilson-Irby determined there was evidence of a chronic right S1 radiculopathy; however no evidence of a generalized large fiber neuropathy, or compressive mononeuropathy existed. (R at 160.) Dr. Wilson-Irby recommended physical therapy. Beginning on August 11, 2003, AmeriHealth Administrators approved Siravo for twelve physical therapy sessions. (R. at 144.) Siravo received physical therapy at NovaCare Rehabilitation for her injuries, however the physical therapist noted Siravo attended only three sessions and was unable to attain her goals because of her poor attendance. (R. at 142, 146.) Siravo testified her poor

4

attendance was "because [she] couldn't get there on time." (R. at 335.)

During 2004, Dr. Perrone provided Siravo treatment for her back at least twenty-eight times during the year. Siravo mainly received OMT for her back, legs, ankles and feet. (R. at 96-116.) On November 15, 2004, Siravo claimed her job pushing a coffee cart led to an increase in back pain. However, Dr. Perrone noted she refused OMT despite being in pain. (R. at 98.)

Dr. Perrone prescribed a number of medications to Siravo over the years. Dr. Perrone first prescribed her with Oxycontin in 1999 and subsequently has given her other various medications over the course of the years to help relieve her back pain, depression, and inability to sleep. Dr. Perrone has prescribed Effexor, Ambien, Alprazolam, Prochlorperazine, Sonata, Diazepam, Amitriptyline, Zyprexa, Oxycontin, Percocet, Panlor SS, Zydone, Vicodin, and Duragesic. (R. at 296-298.)

Siravo also alleges she suffers from various mental impairments including depression, anxiety, and sleeping disorders resulting from her back injury. On March 31, 1998, Siravo was referred to psychologist, Dr. Sherri Landes for treatment of her emotional issues resulting from her back injury. (R. at 178.) Dr. Landes noted Siravo, as a result of the accident, was depressed, anxious and suffered from sleep disturbance. (R. at 178.) Dr. Landes diagnosed Siravo with pain disorder associated with her herniated lumbar disc and prolonged depressive order. (R. at 181.) Dr. Landes recommended psychotherapy for Siravo's depression and adjustment to her injury and biofeedback training for general anxiety reduction and pain management. (R. at 181.) However, there is no evidence she received any on-going treatment.

In 2000, Dr. Perrone first prescribed her Effexor XR for treatment of depression. From 2000 to 2002, Dr. Perrone also prescribed Siravo with Alprazulam, Prochlorperazine, Diazepam

typically used for treatment of anxiety, Ambien and Sonata typically used for treatment of insomnia and Zyprexa which is typically used for treatment of schizophrenia and acute manic episodes. (R. at 296-297.)

In addition to the above listed prescriptions the record indicates on March 25, 2002, Dr. Perrone noted Siravo complained she had trouble sleeping, was exhausted and had no motivation. (R. at 134.) On May 29, 2002, Dr. Perrone noted Siravo was still not sleeping and indicated he may "look into" depression. (R at 132.) In July 2003, Dr. Perrone noted Siravo complained she could not function without her medication and was not able to concentrate and lacked motivation. (R. at 126.) In March 2004 Dr. Perrone noted Siravo again complained she had an increase in depression and problem sleeping. (R. at 114.) Finally, on May 10, 2004 and on September 7, 2004, Dr. Perrone noted Siravo claimed she had an increase in daily anxiety attacks. (R at 101, 110.)

It is undisputed that Siravo was covered for disability insurance benefits through September 30, 2003 and so to be eligible for DIB must establish a disability which began on or before September 30, 2003. Siravo filed a claim on March 14, 2005. The claim was denied initially on April 11, 2005. Siravo requested a hearing which was held on April 21, 2006. At the hearing, Siravo testified, as did her husband Robert Siravo and Vocational Expert Gary Young.

During the hearing, Siravo and her husband testified they adopted a newborn in 2004, which is after Siravo's alleged onset date of her disability. (R. at 313-14.) Siravo testified that Dr. Perrone "signed off" on her medical records which were needed to adopt the baby. (R. at 328.) During testimony, the ALJ noted the apparent inconsistency with Siravo being medically cleared to adopt a newborn while now claiming she was disabled. (R. at 314.) Siravo testified she usually

wears a back brace while at home with her child and is able to sit or lay down when needed. (R. at 314.) Siravo testified her husband and parents both help her care for the child. (R. at 314.) Mr. Siravo testified he primarily takes care of the baby, which includes changing and dressing the baby in the morning. (R. at 330.) Siravo testified she is able to lift the baby but cannot carry her for a distance. (R. at 326.) Despite Claimant's limitations, Mr. Siravo expressed their desire to have a child and that he was not concerned about leaving his wife alone with the baby because they have developed an adequate routine for caring for the baby. (R. at 331-32.)

      Regarding her limitations, Siravo testified she can take care of basic needs, such as brushing her teeth, but she has trouble doing more intricate tasks. (R. at 322.) Siravo can drive but only for short distances. (R. at 322.) She also testified that she has trouble sleeping at night and has tried taking medication and using relaxation tapes to help her sleep. (R. at 323.) Siravo testified her husband does most of the household chores, but she can dust, fold the laundry, and sometimes fill the dishwasher. (R. at 323.) Siravo's husband does the grocery shopping because Siravo said that she sometimes loses feeling in her legs while walking down the aisles. (R. at 325.) Finally, Siravo testified they moved to a one story house because she had difficulty going up and down the stairs in her previous home. (R. at 326.) She indicated she has "bad days" but the medication helps. (R. at 326.) Presently, Siravo testified that overall she feels that both the pain and the medication confine her to the home. She is unable to work five days a week because she cannot drive and needs to be able to sit or lay down during the day. (R. at 327.) She also believes she needs to focus her limited energy on caring for her child. (R. at 326.)

      During testimony, Siravo indicated she previously worked as a restaurant manager from 1976 through 1996 but quit because as a result of her back injury was unable to do any lifting and

felt operating the registers and handling money were too strenuous. (R. at 316.) Siravo testified she attempted to work again following her second back surgery but was unable to find suitable work. First, she worked for the Housing Authority doing mostly administrative work but left the job because it was "a lot of pressure, a lot of stress," and she had to be on her feet too much. (R. at 320.) Siravo testified she then worked for the Census Bureau for one month but had difficulty because the job required a lot of walking, sitting, and steps. (R. at 320.) Next, Siravo worked as a cashier for about three weeks; however, she testified she would work for an hour and a half and would be in a lot of pain. (R. at 320.) Also, she felt uncomfortable working the cash register stating, "[Y]ou know I would be afraid, I think I wasn't quick enough." (R. at 321.) Lastly, she worked at a restaurant but stopped because she was physically unable to perform many of the tasks, specifically lifting and setting up the table. (R. at 321.)

ALJ Moskal issued her decision denying Siravo's claims on June 26, 2006. Siravo timely appealed from this decision, and this court has jurisdiction pursuant to 42 U.S.C. § 405(g).

## II.     STANDARD OF REVIEW

District Court review of the Commissioner's final decision is limited to ascertaining whether the decision is supported by substantial evidence. Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999) (citing 42 U.S.C. § 405(g)). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Morales v. Apfel, 225 F.3d 310, 316 (3d Cir. 2000) (quoting Plummer v. Apfel, 186 F.3d 422, 422 (3d Cir. 1999)). If the Commissioner's determination is supported by substantial evidence, the Court may not set aside the decision, even if the Court "would have decided the factual inquiry differently." Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) (citing

Hartranft, 181 F.3d 358, 360 (3d Cir. 1999)); see also Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992) (citing Early v. Heckler, 743 F.2d 1002, 1007 (3d Cir. 1984) ("A district court may not weigh the evidence or substitute its conclusions for those of the fact-finder.")).

Nevertheless, the reviewing court must be wary of treating "the existence vel non of substantial evidence as merely a quantitative exercise" or as "a talismanic or self-executing formula for adjudication." Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983) ("The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham."). The Court must set aside the Commissioner's decision if the Commissioner did not take into account the entire record or failed to resolve an evidentiary conflict. Schonewolf v. Callahan, 972 F. Supp. 277, 284-85 (D.N.J. 1997) (citing Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978)) ("[U]nless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."). Furthermore, evidence is not substantial if "it constitutes not evidence but mere conclusion," or if the ALJ "ignores, or fails to resolve, a conflict created by countervailing evidence." Wallace v. Secretary of Health and Human Servs., 722 F.2d 1150, 1153 (3d Cir. 1983) (citing Kent, 710 F.2d 110, 114 (3d Cir. 1983)).

## III.   DISCUSSION

The Commissioner conducts a five step inquiry to determine whether a claimant is disabled. 20 C.F.R. § 404.1520; Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004). The Commissioner first evaluates whether the claimant is currently engaging in a "substantial gainful

activity." Such activity bars the receipt of benefits. 20 C.F.R. § 404.1520(a). The Commissioner then ascertains whether the claimant is suffering from a severe impairment, meaning "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the Commissioner finds that the claimant's condition is severe, the Commissioner determines whether it meets or equals a listed impairment. 20 C.F.R. § 404.1520(d). If the condition is equivalent to a listed impairment, the claimant is entitled to benefits; if not, the Commissioner continues to step four to evaluate the claimant's residual functional capacity ("RFC") and to analyze whether the RFC would entitle the claimant to return to her "past relevant work." 20 C.F.R. § 404.1520(e). The ability to return to past relevant work precludes a finding of disability. If the Commissioner finds the claimant unable to resume past relevant work, the burden shifts to the Commissioner to demonstrate the claimant's capacity to perform work available "in significant numbers in the national economy." Jones, 364 F.3d at 503 (citing 20 C.F.R. § 404.1520(f)).

For disability insurance benefits, a claimant must meet the insured requirements of the Social Security Act. To receive these benefits, a claimant must prove disability on or before the date the insured requirements were last met. ALJ Moskal first determined Siravo last met the insured status requirements of the Social Security Act on September 30, 2003. ALJ Moskal then applied the five-step process to evaluate whether Siravo was disabled. ALJ Moskal first determined that Siravo has not engaged in substantial gainful activity at any time relevant to this decision. (R. at 17.) ALJ Moskal noted Siravo worked briefly during 2000, 2003 and 2004 but the income did not represent substantial gainful activity. ALJ Moskal next concluded Siravo's back impairment was a severe impairment, but it did not meet or medically equal the criteria of

any impairments, specifically listing 1.00 (Musculoskeletal Disorders). ( R. at 17.) ALJ Moskal also concluded Siravo's mental impairments were not severe and had little effect on her ability to work. (R. at 18.) ALJ Moskal next determined that Siravo could not perform any of her past relevant work as a restaurant worker, but she had the residual functional capacity to perform the strength demands of simple unskilled sedentary to light work. Accordingly, ALJ Moskal determined Siravo retained the ability to sit for six hours and stand/walk for six hours, with routine breaks in an eight hour day. (R. at 18.) Furthermore, Siravo is able to lift twenty pounds occasionally, in work that had the option to sit and stand at will, and is able to perform simple one to two step repetitive tasks. (R. at 18.) Finally, ALJ Moskal asked the vocational expert if there are jobs available in the region and nation for a young person, with a GED, who is able to perform sedentary to light work. The ALJ also asked the vocational expert to take into consideration the use of pain medication and to make sure the person is able to change positions between sitting and standing. (R. at 338.) Mr. Young testified suitable jobs in the workplace do exist and provided a cashier at a gas station as an example. Ultimately, relying on the RFC determination and the testimony of Vocational Expert Young, ALJ Moskal concluded through the date last insured, jobs exist in significant numbers in the national economy which Claimant can perform.

  Siravo argues that ALJ Moskal's decision is not supported by substantial evidence. First, she assigns error to ALJ Moskal's determination that there was not enough sufficient objective medical evidence to establish that Claimant suffers from severe mental impairments. In addition, Claimant argues ALJ Moskal failed to properly credit her subjective complaints. Lastly, Claimant argues ALJ Moskal improperly stated the hypothetical questions to the vocational expert, particularly by failing to ask the vocational expert the extent of her pain and specific physical

limitations. The Commissioner argues that the ALJ Moskal's decision was supported by substantial evidence and should be affirmed.

    A.    <u>Mental Impairment</u>

Siravo argues that ALJ Moskal failed to properly consider all the objective medical evidence when determining Siravo does not suffer from a mental impairment. Specifically, Claimant asserts that ALJ Moskal only considered Claimant's testimony and failed to fully develop and consider the medical record discussing Claimant's mental impairments. Furthermore, Claimant asserts ALJ Moskal substituted her own opinion for the judgment of Claimant's primary care physician.

The Court disagrees. An ALJ must corroborate claimant's subjective complaints with objective medical evidence. <u>See</u> 20 C.F.R. § 404.1529(a), (b) ("Statements about your pain or other symptoms will not alone establish that you are disabled; there must be medical signs and laboratory findings which show that you have a medical impairmant.") However, when evaluating a claimant's disability an ALJ cannot "supplant[ ] the opinions of a claimant's treating and examining physicians with [the ALJ's] personal observation and speculation." <u>Morales v. Apfel</u>, 225 F.3d 310, 317 (3d Cir. 2000).

While the majority of the analysis was based on Claimant's testimony, ALJ Moskal did also consider Claimant's medical record when evaluating Siravo's mental impairments. ALJ Moskal specifically acknowledges Siravo's psychotherapy treatment in 1998 in her analysis but notes that Dr. Landes' report was before the alleged onset date. (R. at 18.) ALJ Moskal also references the fact that Dr. Perrone prescribed Siravo anti-depressant medication during the adjudication period. (R. at 18.)

12

From 2002 to 2005, Dr. Perrone did periodically note that Siravo complained of depression. (R. at 96, 100-10, 114, 126, 132-34.) For example, on March 25, 2002, Dr. Perrone noted "[Siravo] has trouble sleeping, claims no motivation [and is] exhausted." (R. at 134.) However, Dr. Perrone simply recited Siravo's subject complaints and did not make a medical diagnosis that Siravo had any limitations associated with her claims.

Furthermore, ALJ Moskal appropriately and thoroughly evaluated Claimant's mental impairments based on her ability to perform activities of daily living, maintain social functioning, maintain concentration, persistence, or pace; and episodes of decompensation. See C.F.R. 404.1520(a). First, ALJ Moskal concluded that Siravo was not restricted in her activities of daily living. (R. at 18.) For example, Siravo testified she takes care of her own personal hygiene needs and does some light household chores with help from her husband. (R. at 63-5.) The ALJ then concluded Siravo has had no difficulties maintaining social functioning noting the fact she got along well with her family, including her mother-in-law who moved in to help care for their baby. (R. at 18.) The ALJ did acknowledge Siravo's mild difficulties in maintaining concentration, persistence, or pace but ultimately concluded Siravo was still able to concentrate based on her testimony that she does crossword puzzles and is able to drive for short distances. (R. at 18.) Lastly, Siravo presented no evidence of episodes of decompensation. (R. at 18.)

ALJ Moskal did not substitute her personal observations for Dr. Perrone's opinions, but rather based on the medical evidence and Claimant's testimony she concluded that Claimant's inability to function was more likely a result of her back problems and pain medication then her depression. See Morales, 225 F.3d at 317. ALJ Moskal's decision reflects that she took all this evidence regarding Siravo's mental health and ability to function into account in making her

13

decision. Therefore, ALJ Moskal's determination that Siravo did not have a severe mental impairment is supported by substantial evidence.

    B.    Credibility

Siravo argues ALJ Moskal failed to credit Claimant's subjective complaints. Claimant alleges ALJ Moskal failed to adequately consider her limitations and restrictions on daily activity and the impact of her medication. Furthermore, Claimant alleges ALJ Moskal mischaracterized her allegations of severe pain because she did not receive any specialized treatment for her back.

An ALJ should consider a claimant's subjective complaints of pain even if not fully confirmed by the objective medical evidence. Smith v. Califano, 637 F.2d 968, 972 (3d Cir. 1981); Bittel v. Richardson, 441 F.2d 1193, 1195 (3d Cir. 1971). Here, ALJ Moskal did adequately consider Claimant's subjective complaints regarding her back pain relating to her restrictions on her daily activities, including her limitations with household chores and caring for the newborn. (R. at 21.)

The Court agrees with ALJ Moskal that Claimant's adoption of the newborn compromises her credibility regarding her testimony about her daily activities. The Claimant asserts her adoption of her newborn is not a factor a court should consider in analyzing her limitations. The Third Circuit has held that a "sporadic and transitory" activity cannot be used to show a claimant's ability to engage in substantial activity. Fargnoli v. Massanari, 247 F.3d 34, 40 n.5 (3d Cir. 2001) (stating that the claimant's trip to Europe could not be the basis for finding that he was capable of doing a light exertional job). The Claimant relies on Fargnoli as support for her argument that the adoption should not be a factor taken into account in determining her credibility. However, the adoption of a baby is categorically different than taking a trip to Europe, and the care of a baby

14

over a lifetime could not possibly be viewed as "sporadic and transitory."  Id.  Siravo testified that both her husband and parents help her take care of the newborn.  (R. at 314.)  However, Claimant also testified that she is unable to work because she believes she needs to focus her limited energy on caring for her child.  (R. at 326.)

Claimant argues ALJ Moskal has violated her "fundamental rights in adopting a child" when ALJ Moskal points to the inconsistency with Claimant's argument she is disabled yet still able to adopt a newborn.  (Compl. at 14.)  However, Claimant improperly characterizes ALJ Moskal's analysis.  The inconsistency is not that she was disabled and adopted a baby.  Rather as ALJ Moskal noted,  the inconsistency lies within the fact that Dr. Perrone, the same primary care physician whose record Siravo relies on to prove her disability, also medically cleared her during the adoption process.  (R. at 328.)

In addition to Claimant's subjective complaints ALJ Moskal pointed to inconsistencies within the medical records, which also undermine Siravo's credibility.  The record does indicate over the years Dr. Perrone provided OMT for Claimant's pain.  However,  the medical record does not contain records from Dr. Perrone from 1998 through 2001, which is a significant portion of the time being adjudicated.  ALJ Moskal considered that the majority of Siravo's treatment was limited to being medicated for pain and receiving therapy from Dr. Perrone.  (R. at 21.)  In addition, ALJ Moskal points out that Siravo dropped out of her physical therapy because "[she] could not get there on time."  (R. at 335.)

ALJ Moskal did evaluate Claimant's subjective complaints and compared her testimony to the objective medical evidence, which did not fully support these complaints.  ALJ Moskal's determination that Claimant's statements concerning the intensity, duration and limiting effects of

her symptoms are not entirely credible is supported by substantial evidence.

      C.      <u>Vocational Expert</u>

Siravo alleges ALJ Moskal failed to ask Mr. Young, the vocational expert, an adequate hypothetical question reflecting all of her impairments.  Claimant asserts the hypothetical question did not address her pain and physical limitations, and in particular failed to take into account her need to alternate between sitting and standing and her difficulty in climbing stairs. The Third Circuit has found a hypothetical question deficient and not to be considered substantial evidence if the question does not reflect all of claimant's impairments that are supported by the record. <u>Chrupcala v. Heckler</u>, 829 F. 2d 1269, 1276 (3d Cir. 1997).  However, an ALJ is not required to submit to the vocational expert every limitation alleged by the claimant, but only all of Claimant's credibly established limitations.  <u>Rutherford v. Barnhart</u>, 399 F.3d 546, 554 (3d. Cir 2005).

Here, ALJ Moskal addressed Siravo's mental limitations and pain by instructing the vocational expert to take into account "the issue of the pain meds [Siravo] relies on [and] to keep her to simple one and two step jobs." (R. at 338.)  ALJ Moskal also addresses her physical limitations by instructing the vocational expert to limit her work to "sedentary to light" and " [to] give [Siravo] the opportunity to change positions between sitting and standing." (R. at 338.)

ALJ Moskal found only these limitations to be credible, and they are reflected in the question posed to the vocational expert.  Moreover, Siravo does not point to any other credible limitations that allegedly should have been included.  Therefore, ALJ Moskal properly submitted all of Claimant's credibly established limitations to the vocational expert.

## IV.      CONCLUSION

Because ALJ Moskal's decision is supported by substantial evidence in the record, the

Court affirms her decision that Siravo was not disabled on September 30, 2003 and is therefore not entitled to DIB.


Dated:  8-12-08                                             /s/ Robert B. Kugler
                                                            ROBERT B. KUGLER
                                                            United States District Judge